**DAHLSTROM CORPORATION,**
Appellant,

v.

**Stanford MARTIN, Sr., et al., Appellees.**

No. 17309.

Court of Civil Appeals of Texas,
Houston (1st Dist.).

March 1, 1979.
Rehearing Denied April 12, 1979.

Stayton, Maloney, Hearne & Babb, Douglass D. Hearne, Austin, for appellant.

Miller, Gann & Perdue, Wm. Mac Gann, Houston, for appellees.

Before COLEMAN, C. J., and WARREN and DOYLE, JJ.

COLEMAN, Chief Justice.

This is a suit to recover damages for the wrongful excavation of dirt. Following a trial before the court, the landowners were awarded judgment against Dahlstrom Corporation for actual damages and punitive damages.

It is undisputed that employees of the Dahlstrom Corporation entered upon a tract owned by the appellees without permission and thereafter removed some 70,000 cubic yards of soil from the land. This soil was removed from the premises for use in the construction of a state highway. The Dahlstrom Corporation attacks the measure of damages on which the trial court based his award and the sufficiency of the evidence to support the amount of damages awarded.

█ Earth or sand in its original bed is a part of realty and as such cannot be a subject of conversion; but where it has been wrongfully severed and removed, it becomes personalty for the conversion of which an action will lie. These materials continue to be the property of the landowner after they are removed from their bed or place in the soil. *Cage Bros. v. Whiteman,* 139 Tex. 522, 163 S.W.2d 638 (1942).

█ One who willfully or in bad faith trespasses on the land of another and removes minerals is liable to the owner for their full value computed as of the time the trespasser converted them to his own use, or otherwise stated, the trespasser is liable for the enhanced value of the product when and where it is finally converted, without any deduction for expenses incurred, or for any value he may have added to the mineral by his labor. *Cage Bros. v. Whiteman,* supra; 54 Am.Jur.2d Mines & Minerals, Sec. 254, p. 441.

█ On the other hand, one who inadvertently, or under a claim of right or a *bona fide* belief of title, encroaches upon the land of another and mines or removes minerals therefrom is generally held to be liable in damages only for the minerals removed, based upon their value *in situ,* that is, as they lay in the earth before being disturbed. 54 Am.Jur.2d Mines & Minerals, Sec. 253, p. 438.

There is evidence that Mrs. George I. Huffman, a real estate broker, had leased the land in question for rice farming, dry farming and grazing purposes for the owners, hereinafter referred to as Martins. She negotiated the leases, collected the rentals, paid the taxes and accounted to the Martins for the proceeds. In September, 1974, she was approached by the Dahlstrom Corporation, who desired to lease the land for the purpose of removing top soil and fill dirt from the land in question. The evidence supports the conclusion that she agreed to assist them in securing such a lease from the Martins and that the Dahlstrom Corporation agreed to pay her for her efforts in this regard. She entered into negotiations with the Martins on September 30, 1974, at which time she sent them a contract for execution. This offer was not immediately accepted and negotiations between the Martins and Mrs. Huffman ensued. In answer to a question Mrs. Huffman informed the Martins that she was assisting the Dahlstrom Corporation in securing a contract for the dirt and expected compensation to be paid by the Dahlstrom Corporation. The Martins agreed to the terms of a contract to sell soil she presented provided that Dahlstrom would guarantee to excavate a minimum amount of dirt and would deposit in escrow the dollar value of the minimum guarantee. This counter-offer was sent to Mrs. Huffman by John S. Martin. Mrs. Huffman had previously dealt with Mrs. Della H. Martin. On December 17, 1974, Mrs. Huffman wrote Mrs. Della H. Martin a letter in which she asked her who John S. Martin was and informed her that she had forwarded the letter which she received in November to the Dahlstrom Corporation and that the Dahlstrom Corporation would get in touch with her.

Maurice Clark is a vice president of the Dahlstrom Corporation and was in charge of securing borrow sources for the State Highway 288 project in Brazoria County, Texas. He testified that he visited with various property owners and with Mrs.

Huffman in securing borrow material. He drafted lease agreements with four property owners in connection with this project. Work was begun on the project in the latter part of 1973. He knew of the negotiations between Mrs. Huffman and the Martins, and knew that the Martins had agreed to the terms of the lease which he had prepared except that they desired that the money be placed in escrow. He and Mr. Jack Dahlstrom, his superior, visited with Mrs. Huffman about the negotiations and determined that since it would be about a year before they needed the dirt from that tract of land, the money should not be placed in escrow that far in advance. He did not know whether the Martins were ever informed of this fact. In December of 1974 Clark went to another project in the State of Mississippi without leaving anyone in charge of these negotiations. In March of 1975 while he was still in Mississippi he learned that no agreement had been reached with the Martins.

On November 24, 1975, an agent from the Dahlstrom Corporation wrote a letter to Mr. Martin enclosing a copy of an addendum to a lease agreement and requested that it be executed by the Martins. Since this agreement recited that it was an addition to an existing lease agreement between the Martins and the Dahlstrom Corporation, Mr. Martin immediately wrote back and called attention to the fact that no lease agreement had been executed.

The Dahlstrom Corporation had begun to excavate and remove soil from the Martins' land in the latter part of August, 1975, and continued to remove this soil until December 23, 1975. Both Mr. Dahlstrom, the president of the company, and Mr. Martin knew that the Martins had refused to execute a lease unless the money which would become due under the lease was first placed in escrow. After the decision not to place the money in escrow was made, no further negotiations occurred until after some 49,000 cubic yards of material had been removed from the Martin tract.

In December Mr. Covington was in charge of this operation on the part of the Dahlstrom operation. He learned that there was no lease in effect on the Martin land and called Mr. John S. Martin and told him that they had made a mistake and had begun the excavation of dirt from his property. He told Mr. Martin that as soon as he was able to determine the exact amount of dirt that had been excavated he would send him a check for that amount along with a new lease agreement. Mr. Covington testified that he had further conversations with Mr. Martin at which time he had the exact figures and that Mr. Martin agreed to accept payment at the rate of 25 cents per cubic foot for the soil excavated and to return a signed lease agreement authorizing the Dahlstrom Corporation to take an additional amount of the soil from their land. Mr. Martin denied that he made this agreement. During these negotiations excavation of the soil was continued by the Dahlstrom Corporation. Mr. Covington testified that he called Mr. Marton on December 4, 1975, and that during this conversation Mr. Martin authorized him to continue to remove dirt to the end of the month. Mr. Martin also denied that he authorized Mr. Covington to continue removing dirt. The proposed lease which was sent to the Martins by Mrs. Huffman provided that payment would be made for the dirt removed monthly. Mr. Covington explained the failure to make monthly payments by saying that he had not examined the proposed lease at the time the dirt was being removed and he did not realize that monthly payments were required.

■ The evidence supports an implied finding by the trial court that the Dahlstrom Corporation trespassed on the land of the Martins under such circumstances as to charge the Corporation with knowledge that it was invading the rights of the Martins. By reason of such a finding the Dahlstrom Corporation is in the position of a willful trespasser and is liable to the Martins for the full value of the material removed from the Martin land without any deduction for expenses incurred in excavating the soil. *Cage Bros. v. Whiteman,* supra; *Kelvin Lumber & Supply Co. v. Cop-*

*per State Mining Co.,* 232 S.W. 858 (Tex. Civ.App. El Paso 1921, error dism.). See annotation: Oil or Minerals-Trespass Damages, 21 A.L.R.2d 380.

Darwin Allen Morrow testified as an expert as to the value of soil in the Brazoria County area. He had been engaged in the dirt contracting business since 1966. His business involves the obtaining of rights to remove dirt by paying a royalty, the removal of the dirt and the selling of same. He testified that he was generally familiar with the value of dirt as it is removed from a pit and loaded into trucks. He had examined the pit on the Martin property from which the Dahlstrom Corporation had removed soil. He testified that in measuring the yardage of an excavation there is a difference between pit yards and truck yards. That pit yards refers to the soil in place on the ground. Truck yards refers to the loose soil after excavation loaded into a truck. He estimated that there would be approximately 30% more truck yards removed from a tract of land than there would be pit yards on the land. Soil is sold both ways, but the generally accepted way of selling it locally is by the truck yard. He estimated that there was approximately 18,-841 truck yards or 14,057 pit yards of top soil removed from the Martin property. He testified that he sold top soil in that area for $5.00 a yard loaded on the truck. His cost would be from $3.75 to $4.00 per yard. He estimated that the cost of fill dirt loaded on the truck was $1.00 per truck yard and would sell for $1.25 per truck yard. Ordinarily when he sold dirt he delivered dirt in his own truck which involved additional expense and resulted in a different price. The prices he quoted were the same in 1975 and 1976. The fair cash market value of the dirt in place on the Martin tract between September 1975 and January of 1976 was 25 cents per cubic yard. He testified that he had never purchased as much as 70,000 cubic yards of fill dirt in that area and sold it at one time from one place. The largest haul and sell job that he had ever handled involved 10 to 12,000 cubic yards.

Mr. Martin testified that it cost the Dahlstrom Corporation 14.1 cents per cubic yard to excavate and load fill material from the Martin site between August of 1975 and December of 1975. There was evidence that the fair market value of soil in place at that time was 25 cents per cubic yard.

There is no opinion testimony as to the fair market value of soil in the quantity taken from the pit located on the Martin property. The trial court assessed damages against the Dahlstrom Corporation in the amount of $70,286.00 or $1.00 per pit yard of soil removed from the land. In *Needham Piano & Organ Co. v. Hollingsworth,* 91 Tex. 49, 40 S.W. 787 (1897) the court stated: " . . . the value at which a stock of goods may be sold at retail, standing alone, in our opinion, does not afford any sufficient basis for determining fair market value. The market value is what the goods could have been promptly sold for in bulk or in convenient lots. Between the prices at which goods may be obtained in a market and at which they may be sold at retail in the same place intervene time, expense, and profit, which, in the absence of proof, are unknown quantities; and hence, if there had been no other testimony save that pointed out in the petition for the writ, we would be still of the opinion that there was no evidence to justify the verdict for the defendants to the amount recovered by them. But counsel for the defendants in error in argument have referred us to other parts of the transcript, which, in our opinion disclose legitimate evidence tending to show that the market value of the goods exceeded the amount recovered. . . . "

There is no evidence that no market for soil in the amount taken by the Dahlstrom Corporation existed in Brazoria County at the time of the taking. The plaintiffs were not required to present evidence that such a market existed. It was their burden to produce evidence from which the trial court could determine the reasonable cash market value of soil when sold in convenient lots in Brazoria County at the time of the taking. There was testimony from which the trial court could have

arrived at the selling price of soil in truck loads per cubic yard. It was within its discretion to determine that a cubic yard was a convenient lot for the sale of top soil. The testimony as to the cost of top soil at the pit, eliminating profit, was legitimate evidence tending to show that the market value of the soil exceeded the amount recovered.

The trial court also awarded exemplary damages. In support of the judgment we imply a finding that the trespass was willful since there is evidence to support such a finding. The chief executives of the Corporation knew, or should have known, that the Martins had not agreed to allow the Dahlstrom Corporation to enter upon their property for the purpose of removing soil. The plaintiffs are not seeking damages for the trespass. They have rested their case on allegations of conversion of soil. In *Ogle v. Craig,* 464 S.W.2d 95 (Tex.1971), an action for conversion of soy beans, the plaintiff recovered in the trial court both actual and exemplary damages. The Supreme Court stated as the applicable rule for determining whether damages could be recovered:

"The fact that an act is unlawful is not of itself ground for an award of exemplary or punitive damages. The act complained of not only must be unlawful but also must partake of a wanton and malicious nature, or, as sometimes stated, somewhat of a criminal or wanton nature, and an act will not be deemed malicious, and so warranting punitive damages, merely because it is unlawful or wrongful." We find no evidence supporting a finding that the taking in this case was wanton or malicious in nature. Nor is there any evidence in this case of an element of fraud, malice, oppression, or evil intent. The trial court erred in awarding exemplary damages. *Atlas Chemical Industries, Inc. v. M. P. Anderson,* 524 S.W.2d 681 (Tex.1975).

■ At the time the agents of the Dahlstrom Corporation entered on the property and began removing soil they thought the land had been leased by the Dahlstrom Corporation. Mr. Clark, the vice president, knew or had possession of facts from which he should have known, that there was no lease with the Martins. Within a short period of time after he discovered that operations were proceeding to remove soil from the land he notified Mr. Martin of the situation and offered to pay for the soil removed at the price previously agreed upon with the Martins. While the excavation and removal of soil was not immediately stopped, Mr. Martin was advised that the Corporation desired to continue operations. Martin testified that he did not agree to permit the operation nor did he tell them to stop removing soil. Under these circumstances the continuance of operation was not that entire want of care which would raise the belief that the continued removal of soil was the result of a conscious indifference to the right or welfare of the Martins which would authorize the imposition of exemplary damages.

The Dahlstrom Corporation contends that under the evidence their defense of accord and satisfaction was established as a matter of law or that an implied finding that there was no accord and satisfaction was contrary to the great weight and preponderance of the evidence.

■ The defense of accord and satisfaction rests upon a new contract, express or implied, in which the parties agree to the discharge of the existing obligation by means of a lesser payment tendered and accepted. *Industrial Life Insurance Co. v. Finley,* 382 S.W.2d 100 (Tex.1964). There must be evidence that the parties agreed that the amount paid was in full satisfaction of the claim. *Jenkins v. Henry C. Beck Co.,* 449 S.W.2d 454 (Tex.1969).

■ Mr. Covington, an agent of the Dahlstrom Corporation, testified that John S. Martin agreed that he would accept payment for the soil removed at the rate of 25 cents per yard and would sign a lease agreement which would permit the Corporation to remove additional amounts of the soil. A lease was drawn up and a check in the correct amount was executed and both instruments were mailed to Mr. Martin.

Martin kept the check but did not cash it. Within a short period of time Martin notified the Dahlstrom Corporation that he would conduct future negotiations through his attorney and soon thereafter filed this suit. Mr. Martin owned an undivided one-half of the land from which the soil was removed. The lease was not prepared for his signature nor was he named a payee in the check. Mr. Martin testified that when he had a telephone conversation with Mr. Covington about the lease and the check he learned for the first time how much soil had been taken and the value the Dahlstrom Corporation put on the soil. Mr. Martin testified that in that conversation he did not indicate that he would accept the check as settlement for the materials taken. While there is a substantial dispute in the evidence, the trial court's failure to find accord and satisfaction is not contrary to the great weight and preponderance of the evidence. A finding in favor of the Dahlstrom Corporation on this issue is not required as a matter of law. An agreement to accept the check in full satisfaction of the claim for the soil removed was not established by undisputed evidence. See *De Shazo v. Wool Growers Central Storage Co.*, 139 Tex. 143, 162 S.W.2d 401 (1942).

■ The appellant's points relating to the award of actual damages are no evidence points since they complain of the action of the trial court in entering judgment. In considering no evidence points this court must review only the evidence favorable to the findings of the trial court on which the judgment is entered.

The trial court's judgment, dated May 24, 1978, decreed that the Martins recover $70,286.00 in actual damages and that such sum was to bear interest at the rate of 9% per annum from December 23, 1975. In making this award, the trial court has confused the rate of interest which is only applicable from and after the date of judgment, Tex.Rev.Civ.Stat.Ann. art. 5069–1.05, with the legal rate which is applicable when interest is awarded as an element of damages, Tex.Rev.Civ.Stat.Ann. art. 5069–1.03. Interest properly should have been allowed at the rate of 6% per annum from December 23, 1975, to May 24, 1978. Thereafter the judgment would bear interest at the rate of 9% per annum.

The judgment will be modified by eliminating the award of exemplary damages and by modifying the interest award in accordance with this opinion, and as so modified the judgment will be affirmed.

### On Motion for Rehearing

■ There was testimony that top soil sold for $5.00 a yard. The cost of preparation for sale was $3.75 to $4.00 per yard. After the cost of preparation is eliminated the court could conclude that the market value of soil was at least $1.00 per cubic yard. There was also evidence from the expert, who testified that he knew the value of dirt at the pit, that fill dirt would sell for $1.25 a truck yard. This testimony supports the fact finding as to value made by the trial judge.

The motion for rehearing is denied.